UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                                        |   |                              |
|----------------------------------------|---|------------------------------|
| DOUGLAS J. MACLEAN,                    | ) |                              |
|     Plaintiff,                         | ) |                              |
|        v.                              | ) | CIVIL ACTION                 |
|                                        | ) | NO. 14-40038-TSH             |
| TD BANK, N.A.,                         | ) |                              |
|     Defendant.                         | ) |                              |

## ORDER ON DEFENDANT TD BANK N.A.'S MOTION TO DISMISS (Docket No. 11) AND PLAINTIFF DOUGLAS J. MACLEAN'S MOTION FOR SUMMARY JUDGMENT (Docket No. 13)
### July 14, 2014

HILLMAN, D.J.

### Introduction

Douglas J. MacLean ("Plaintiff") brought a claim against TD Bank, N.A. ("Defendant") for violations of M.G.L. c. 148 s. 149 (the "Wage Act"). Defendant filed a motion to dismiss the complaint, and in response Plaintiff filed a motion to amend his complaint, which this Court allowed. Defendant then filed its Motion to Dismiss Plaintiff's First Amended Complaint (Docket No. 11). Plaintiff filed an Opposition and Cross-Motion for Summary Judgment (Docket No. 13). For the reasons set forth below, Defendant's Motion to Dismiss is granted and Plaintiff's Cross-Motion for Summary Judgment is denied as moot.

### Facts

Defendant employed Plaintiff from June 1, 1999 until January 6, 2011, the effective date of his layoff, most recently as a Commercial Regional Group Manager II, which is a Senior

Management position. On or about October 28, 2010, Commercial-Lending Division Head Walter Owens and Senior Vice President Brian Gervais notified Plaintiff that Defendant had decided to terminate his employment, effective January 6, 2011. Gervais told Plaintiff that he would remain on payroll and should make himself available should anyone require his assistance, but would not be required to report to work. Plaintiff claims he was not permitted to use any paid time off ("PTO") during this time period. Defendant disagrees, claiming that while Plaintiff was asked to remain "on-call" from October 28 through January 6, he was never told he could not use his PTO during this time period.

Defendant afforded Plaintiff PTO benefits, as with all of its employees, in accordance with the terms of the *Paid Time Off Policy* (the "PTO Policy") contained within its *Employee Handbook*. The PTO Policy provides, in relevant part:

- "The amount of PTO you accrue is based on your length of service, job grade and standard weekly hours. It is accrued over the twenty-six (26) pay periods from January through December. By the last pay period of the year, you will have earned all of your PTO for that year."
- "Standard weekly hours, job grade, and length of service determine your PTO accrual rate."
- "PTO accrual rate may include fractional rounding differences based on which legacy company administers your payroll."
- A full-time member of Senior Management [such as Plaintiffs accrues 12.31 hours of PTO per pay period with a maximum of 320 hours (or 40 days) per year.

- "At no time can you have more than five (5) carryover PTO days in a calendar year. If you have unused PTO at the end of a calendar year, you can carry up to five (5) days, or equivalent standard weekly hours, of this time as PTO for the new calendar year."
- "Exempt Employees are responsible for reporting PTO days used on a timely basis throughout the year. If an exempt Employee does not report used PTO days by a designated day at the close of the calendar year, no PTO days will be carried over into the new calendar year, or paid out upon termination."
- "You will receive payment for earned, but unused PTO, for the current calendar year, as well as any carryover PTO (maximum of five (5) days at any given time) when your employment terminates with TD Bank.... Exempt Employees will be paid for carryover PTO only if this information had been reported to Payroll by a designated day in the previous calendar year."
- "You will earn PTO accrual in the last pay period worked if you are paid fifty percent (50%) or more of your standard weekly hours in that pay period. If you are paid less than fifty percent (50%) of your standard hours in your last pay period, you will not earn PTO accrual."

The PTO Policy also provides that, regardless of the notice period required for using PTO, "you will be charged PTO when you are absent." Plaintiff last acknowledged receipt of the *Employee Handbook* on April 16, 2009.

Plaintiff was employed during the first pay period of 2011, so he accrued 12.32 hours of PTO for that period, amounting to $1,480.77. Defendant paid him that amount, less applicable taxes and withholdings, on January 16, 2011. Plaintiff complained to Karen Rosenau, then Senior Vice President of Human Resources, about not receiving certain PTO payments to which

he claimed he was entitled. Defendant claims that Plaintiff never reported using any PTO in 2010, and therefore was not eligible for any carryover PTO. Plaintiff denies this, claiming he always fully reported using his PTO. Though Defendant denies Plaintiff was entitled to his five carryover PTO days from 2010, it agreed to pay him the five days anyway. On or about March 12, 2011 Defendant paid Plaintiff $4,707.69, representing five days, or 40 hours, of PTO.

On February 23, 2011, Plaintiff signed a *Severance Agreement And General Release* (the "Release") through which Defendant agreed to pay him $494,154.18 in exchange for a release of all claims against it. The Release expressly included a release of "any and all claims or rights under federal, state or local laws, regulations or ordinances relating to the payment of wages, bonuses, incentives and other compensation to employees...." and "any and all rights, entitlements, claims or obligations of any kind whatsoever relating to, arising out of or connected directly or indirectly with any employment agreements, commissions agreements or compensation agreements with the Company...."

By signing the Release, Plaintiff acknowledged and agreed that (1) his "Severance Payment and continuation of benefits [were] made in complete satisfaction of any and all claims for severance pay, bonus pay, incentive pay or any other compensation or benefits to which [he] is or may claim to be entitled;" (2) other than Severance Payments he received, TD Bank "is not under any further obligation to make or provide any payments or benefits to [him];" (3) other than any rights under a 401(k) account, pension plan, equity plan, or for unemployment, he "is entitled to no other wages, compensation, privileges, perquisites, benefits or payments from" TD Bank; (4) he waived "any and all claims or rights under federal, state or local laws, regulations or ordinances relating to the payment of wages, bonuses, incentives or other compensation to employees;" (5) he "will not file or initiate or cause to be filed or initiated on his/her behalf any

Proceeding against [TD Bank] or any of the Company Releasees based upon conduct or matters occurring prior to [February 23, 2011];" and, (6) in the event he participates in any such proceeding, he "waives any monetary benefit, recovery or relief." The Release allowed Plaintiff to cancel within seven days of signing, which Plaintiff did not do, and on March 12, 2011, Defendant paid Plaintiff $494,154.18, less applicable taxes and withholdings, as per the terms of the Release.

Plaintiff now claims Defendant violated the Wage Act because did not pay him for an additional 23 days of PTO he had accrued, but could not use, in 2010 and because it did not timely pay him for the five carry-over days from 2010 that Defendant eventually paid him for.

## **Discussion**

Defendant argues Plaintiff's First Amended Complaint should be dismissed for two reasons: first, that the Release bars Plaintiff from bringing a claim under the Wage Act, and second because Defendant has already paid Plaintiff all the PTO he is entitled to.

On its face, the Release does seem to preclude this action. In exchange for a payment of approximately $500,000, Plaintiff signed an agreement explicitly releasing "any and all claims or rights under federal, state or local laws, regulations or ordinances relating to the payment of wages, bonuses, incentives and other compensation to employees...." and "any and all rights, entitlements, claims or obligations of any kind whatsoever relating to, arising out of or connected directly or indirectly with any employment agreements, commissions agreements or compensation agreements with the Company...." Similar language, such as that reproduced above, specifically stating that the Release applies to all claims for wages and other compensation can be found elsewhere in the Release as well.

However, Plaintiff contends that the Release does not cover any claims under the Wage Act. The Wage Act defines the word "wages" to include "vacation payments due an employee under an oral or written agreement" and states that "any employee discharged from such employment shall be paid in full on the day of his discharge." M.G.L. c. 149 s. 148. The Wage Act also includes a provision stating that "No person shall by special contract with an employee or by any other means exempt himself from this section." *Id.* The Massachusetts Supreme Judicial Court ("SJC") discussed the significance of this provision on releases contained in contracts between employers and employees in *Crocker v. Townsend Oil Co.*, 464 Mass. 1 (2012). The Court began its discussion by noting that "the legislative purpose behind the Wage Act (and especially the "special contract" language) is to provide strong statutory protection for employees and their right to wages." *Crocker*, 464 Mass. at 13. On the other hand, the Court considered "the contravening public policy favoring the enforceability of general releases, and the risk that parties will be unable to settle employment claims by compromising or forgoing a Wage Act claim where that is the intention of all parties." *Id.* at 14. The Court concluded that "a settlement or contract termination agreement by an employee that includes a general release, purporting to release all possible existing claims, will be enforceable as to the statutorily provided rights and remedies conferred by the Wage Act only if such an agreement is stated in clear and unmistakable terms." *Id.* It went on to explain that the release "must be plainly worded and understandable to the average individual" and must "specifically refer to *the rights and claims* under the Wage Act that the employee is waiving," reasoning that this will ensure employees do not unwittingly waive those rights. *Id.* at 14-15 (emphasis added).

In *Crocker*, the Court found that a general release that stated:

[Each plaintiff] hereby forever releases, remises and discharges [Townsend] and its shareholders, directors, officers, employees and agents ... of and from any and

6

> all debts, demands, actions, causes of action, suits, accounts, covenants, contracts, agreements, damages, and any and all claims, demands, obligations and liabilities whatsoever of every name and nature, both in law and equity ... that [the plaintiffs] now have or ever had (or may in the future have, arising out of or in connection with any events occurring on or prior to the date hereof) against [Townsend].... The foregoing release is intended to be a general release of all Claims, to the maximum extent permitted by law, whether or not the subject matter of any such Claim has been the subject of a previous claim or threatened claim made by [the plaintiffs].

was not enough to constitute a waiver of the employee's Wage Act claims. *Id*. at 4 n. 4. That release contained no specific mention of claims to wages or other compensation or to the Wage Act itself. *Id*.

Plaintiff argues for this Court to adopt a 'bright line' test wherein the Release in this case could not constitute a waiver of his Wage Act claims because it does specifically cite to, or name, the "Wage Act." Defendant argues that *Crocker* does not require a release to mention the Wage Act by name, as long as it refers to "the rights and claims" under the Wage Act being waived. 464 Mass. at 14. Defendant claims the language in the release in which Plaintiff relinquished "any and all claims or rights under federal, state or local laws, regulations or ordinances relating to the payment of wages, bonuses, incentives and other compensation to employees" does precisely that, in a manner that is "plainly worded and understandable to the average individual" as required by *Crocker*. *Id*. Defendant points out that this language clearly refers to the payment of wages and other compensation, unlike the general release found insufficient in *Crocker*, and that that explicit language ensures Plaintiff could not "unwittingly" waive his rights under the Wage Act. *Id*. at 14-15.

I find that *Crocker* does not require such a release to contain an explicit citation to the Wage Act, so long as the release makes it clear that an employee is waiving those rights to be paid any wages due under the Wage Act. The SJC could have included in *Crocker* a requirement

7

that releases must cite to the "Wage Act" in order to operate as an effective waiver of those claims. Instead it held that a "plainly worded and understandable" reference to the rights under the Wage Act being released was enough. As the SJC noted, the goal is to ensure an employee does not unwittingly waive those rights; therefore an explicit recitation of those rights that the employee is waiving suffices. The Release in this case contained plainly worded and understandable references to the rights Plaintiff was giving up under the Wage Act by signing the Release. Therefore the Release bars Plaintiff from now bringing claims under the Wage Act, and this case is dismissed.

## Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss the First Amended Complaint (Docket No. 11) is ***granted***, and the case is dismissed. Accordingly, Plaintiff's Motion for Summary Judgment is ***denied*** as moot.

SO ORDERED.

    ***/s/ Timothy S. Hillman***
    **TIMOTHY S. HILLMAN**
    **UNITED STATES DISTRICT JUDGE**